UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                                        )
**JOSE A. BURGOS MARTINEZ,**                            )
                                                        )
            **Plaintiff,**                              )
                                                        )
            **v.**                                      )
                                                        )          **CIVIL ACTION**
                                                        )          **NO.  16-40128-TSH**
**THE CITY OF WORCESTER, a Municipal**                  )
**Corporation, WORCESTER CITY,**                        )
**WORCESTER CHIEF OF POLICE GARY**                      )
**J. GEMME, WORCESTER POLICE**                          )
**DETECTIVES SGT. STEVE ROCHE,**                        )
**MICHAEL A. TARCKINI, WILLIAM**                        )
**ESCOBAR, GARY MORRIS, TERRENCE**                      )
**GAFFNEY, NEFTALI BATISTA,**                           )
**THOMAS J. DUFFY, IGNACIO J.**                         )
**GARCIA, CHRISTOPHER A.**                              )
**PANARELLO and JOHN DOE,**                             )
                                                        )
            **Defendants.**                             )
———————————————————————                                 )


**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION
TO STRIKE (Docket Nos. 62 & 75)**

**NOVEMBER 24, 2020**

**HILLMAN, D.J.,**

     Mr. Burgos Martinez ("Plaintiff") brought this claim for excessive force, conspiracy to

falsify police reports, malicious prosecution, supervisory and *Monell* liability, false arrest/false

imprisonment, assault and battery, unlawful search and seizure, violation of the Massachusetts

Civil Rights Act, and intentional infliction of emotional distress ("IIED") against the City of

Worcester, Chief of Police Jemme, Sergeant Roche, Detectives Tarckini, Escobar, Morris,

Gaffney, Batista, Duffy, Garcia, and Panarello, and John Doe (collectively, "Defendants").  The

Plaintiff alleges that his rights were violated, and he suffered physical and emotional injury when the Defendants, searching for the Plaintiff's son, executed a no-knock search warrant at the Plaintiff's residence on Oread Street.  The Plaintiff withdrew all but his post-arrest excessive force and assault and battery claims against Sgt. Roche (Counts I and V); his conspiracy claim against Sgt. Roche and Detective Morris (Count IV); and his post-arrest IIED claim against Sgt. Roche (Count VIII).

The Defendants move for summary judgment on all remaining claims, and to strike certain statements in the Plaintiff's medical records so that they do not form part of the record for summary judgment.  For the reasons stated below, the Defendants' motion to strike is ***denied*** except as to statements identifying the Plaintiff's alleged assailants as police officers.  The Defendants' motion for summary judgment is ***granted***.

## Procedural and Factual Background

### *Procedural Background*

A related criminal matter in state court and the COVID-19 pandemic significantly delayed discovery and dispositive motions in this case.  On February 26, 2020, the Plaintiff was acquitted of assault and found guilty of resisting arrest at the Oread Street address.  (*Burgos-Martinez v. Commonwealth*, Case No. 1862CR001084, Docket No. 64-13 at 1).

On May 12, 2020, the Plaintiff stipulated to a dismissal of his unlawful search and seizure claims, malicious prosecution claims, false arrest and false imprisonment claims, pre-arrest assault and battery claims, post-assault and battery claims against Detectives Morris and Doe, post-arrest excessive force claims against multiple officers, and Massachusetts Civil Rights Act claims. (Docket No. 61).  In his brief partially opposing the Defendants' motion for

summary judgment, the Plaintiff withdrew his supervisory and *Monell* liability claims (Docket No. 74 at 7) against Sgt. Roche, the Chief of Police, and the City of Worcester and narrowed his civil conspiracy claim from ten defendants to two, Sgt. Roche and Det. Morris. (*Id*. at 1). The Plaintiff's remaining claims for relief are:

- Count I – Post-arrest Excessive Force (*Sgt. Roche*)
- Count IV – Civil Conspiracy (*Sgt. Roche and Det. Morris*)
- Count V – Assault and Battery (*Sgt. Roche*)
- Count VIII – Intentional Infliction of Emotional Distress (*Sgt. Roche*)

*Factual Background*

On July 10, 2013, at about 5:58 pm, a team of nine officers from the Worcester Police Department gang unit executed a no-knock search warrant at the Plaintiff's apartment on Oread Street.  (Incident Rep. at 1, Docket No. 64-1).  The search warrant target was the Plaintiff's adult son, Juan Burgos, who had recently moved in with his parents.  (Search Warrant Application at 2, Docket No. 64-2).  Based on surveillance and controlled purchases of cocaine orchestrated by the gang unit and carried out by confidential informants, the police believed that Juan Burgos was selling narcotics out of his parents' home, though there was no evidence that the Plaintiff or his wife were aware of or were involved with their son's alleged drug trafficking.  (Morris Dep. 16:19-21:12, Docket No. 73-3).

Sgt. Roche, Det. Panarello, and Det. Morris entered the rear door of the apartment, which opened into the kitchen and living room.  (Roche Dep. 14:18-21, Docket No. 73-2).  Juan Burgos, the only individual at home, jumped through his bedroom window and fled the apartment.  (Roche Dep. 13:24-14:5).  While a team of officers pursued Juan Burgos, others, including Sgt. Roche and Dets. Morris and Panarello, remained behind to secure the apartment and conduct a search. (Incident Rep. at 5, Docket No. 64-1).

The Plaintiff then arrived home, saw one of the officers through the open back door, and realized that the police were inside his apartment. (Burgos Dep. 74:11-24, 75: 18-21, Docket No. 73-4). The accounts of what happened next differ wildly.

Sgt. Roche claims that he ordered the Plaintiff to remain outside and advised him that the police had a search warrant, but that the Plaintiff began yelling and cursing, entered the apartment against Sgt. Roche's orders, and charged at Sgt. Roche with his arms raised and hands extended in an aggressive manner. (Roche Dep. 24:8-25:18). Sgt. Roche says that he raised his arms to block the Plaintiff's punches, telling him that he was under arrest. (Roche Dep. 26:4-7, 27:8-14). A struggle ensued, and the momentum from the Plaintiff's charge propelled the two men down the hallway and into Juan Burgos' bedroom, where the larger Plaintiff landed on the bed, on top of Sgt. Roche. (Roche Dep. 27:17-21, 29:8-10). Dets. Panarello and Morris helped Sgt. Roche handcuff the Plaintiff, and one of the officers brought him into the living room without any use of force, where he was read his Miranda rights and shown the search warrant. (Roche Dep. 33:6-13, 35:22-38:10; Morris Dep. 31:6-12, 35:2-15, Docket No. 73-3). Other officers soon returned with Juan Burgos in custody. (Tarckini Dep. 13:6-16, Docket No. 73-7).

Both parties agree that the Plaintiff did not physically resist the officers after he was handcuffed, but they disagree about whether the officers used any force against the Plaintiff after he was handcuffed. (*Compare* Burgos Dep. 108:14-21, 109:6-21, 110:15-16 *with* Roche Dep. 36:20-23, 37:10-14 and Morris Dep. 35:2-15.).

The Plaintiff alleges that when he arrived home and saw the plainclothes officers in his apartment, he called his wife, concerned she might be inside, and approached the back door to ask the officer stationed there what was happening. (Burgos Dep. 77:11-15, 85:8-86:3). According to the Plaintiff, Sgt. Roche told the officer at the door to let the Plaintiff enter.

4

(Burgos Dep. 85:1-7).  But when the Plaintiff stepped inside, Sgt. Roche grabbed him by the neck, slammed him against the kitchen wall, and began dragging him down the hallway towards the bedroom, punching him in his back and ribs, kneeing him, and yelling.  (Burgos Dep. 93:3-94:11).  When they reached Juan Burgos's bedroom, Sgt. Roche pushed the Plaintiff onto the floor with his foot.  (Burgos Dep. 105:1-8).  The Plaintiff landed on his knees, and officers then kicked him in the groin, and struck him in the ribs with an unidentified metal object that the Plaintiff believed was a gun, and tried to put him in a headlock.  (Burgos Dep. 105:9-106:10).  The other officers  helped Sgt. Roche handcuff the Plaintiff.  (Burgos Dep. 108:12-13).  The Plaintiff's wife testified that before she hung up the phone call she overheard her husband state that he was the owner of the apartment and ask what was going on, followed by a person giving her husband permission to come inside, and then sounds consistent with a person being struck. (Mendez-Velez Dep. 21:13-22:12, Docket No. 73-5).  The Plaintiff admits that he may have raised his voice, but that he did not curse, yell, or rush at Sgt. Roche when he entered the apartment, and he deliberately kept his arms lowered to avoid a charge for resisting arrest even after Sgt. Roche assaulted him in the kitchen and began dragging him down the hallway. (Burgos Dep. 89:24-90:14, 92:5-11, 98:21-99:19, 100:13-20).

After the Plaintiff's arms were handcuffed behind his back, the Plaintiff claims that Sgt. Roche brought him back into the living room.  During the short walk from the bedroom, the Plaintiff alleges that Sgt. Roche struck him behind his left ear, ribs, and back with a closed fist, and told a surprised Officer Morris that he was going to "kick [the Plaintiff's] ass." (Burgos Dep. 108:14-111:15; Pl.'s Response to Defs.' Interrogatory No. 3, Docket No. 73-1).  Sgt. Roche also forced the Plaintiff's handcuffed arms upward, behind his back, into a painful position.  (Pl.'s Response to Defs.' Interrogatory No. 3).  Sgt. Roche passed the Defendant to Officer Batista and

walked back to the bedroom.  He returned after a few minutes, then slapped Juan Burgos in the face a few times, knocked a stereo and other items on an entertainment center to the floor, and pointed at the Plaintiff's aquarium and said that he would urinate in the fish tank and make the Plaintiff drink the water. (Burgos Dep. 115:12-21).  There are no pictures of the property damage, but Juan Burgos and the Plaintiff's wife also testified that they saw broken items in the living room after the Plaintiff's arrest, including a broken vase, broken entertainment center, broke radio or stereo with speakers, and fragments of musical records.  (Burgos Dep., 115:12-20, Docket No. 73-4; Juan Burgos Dep. 74:5-16, Docket No. 64-4; Melendez-Velez Dep. 25:17-26:6, Docket No. 73-5).  None of the officers claim to have observed any damage to the living room during or after the Plaintiff's arrest. Then both sides agree that the officers read the Plaintiff his Miranda rights and showed him the search warrant.  (Pl.'s Statement of Material Facts ¶ 48, Docket No. 73).

After the search was complete, the officers transported father and son to the Worcester police station for booking and questioning.  (Pl.'s Statement of Material Facts ¶ 23, Docket No. 73).  The Plaintiff's booking photos do not show any bleeding, swelling, bruising, or other injuries.  (Pl.'s Booking Photos, Docket No. 73-6 at 4-6).  During booking and his subsequent interview with detectives, the Plaintiff told Detectives that he was not sick or injured and did not require medical attention, though he did report the alleged assault during the booking interview. (Trackini Dep. 23:3-15, Docket No. 73-7; Pl.'s Statement of Material Facts ¶ 24, Docket No. 73).

On July 11, 2013, approximately twenty-four hours after his arrest, the Plaintiff sought medical care at the UMass Memorial Emergency Department for various aches and pains in the abdomen, chest, ribs, and head.  (ER Records at 1, Docket No. 64-11).  Nursing and physician records from that evening indicate that the Plaintiff told medical staff that he had been assaulted

and complained of left upper quadrant abdominal, back, and neck pain, as well as throat and neck soreness. (*Id*. at 1,4,6). However, both the examining nurse and physician observed no bruising, cuts, or swelling. (*Id*.). The Plaintiff's x-ray and ultrasound were normal, and the doctor noted that the patient appeared to be uninjured "aside from a possible chest wall/abdominal contusion although no sign of trauma & mild local trauma." (*Id*. at 8). Medical records show that on June 5, June 8, and June 18—a month before the arrest—the Plaintiff had sought treatment for pre-existing moderate, constant left upper quadrant abdominal pain. (Reliant Records, Docket No. 64-12).

In the following months, the Plaintiff sought repeated medical care for left upper quadrant abdominal pain and exhibited symptoms of mental distress. At a July 15, 2013 appointment with the UMass Memorial Primary Care Department he complained that he had been assaulted and continued to have left upper abdominal pain; the treating physician proscribed oxycodone. (Primary Care Records at 1, Docket No. 73-8). The physician's notes from that appointment state that the Plaintiff's increasing pain and tenderness could be due to a rib fracture, that the Plaintiff might have post concussive syndrome, that his affect was teary-eyed and anxious, and that he had "clearly had a traumatic event." (*Id*. at 2). The doctor prescribed oxycodone and lorazepam "to help with his anxiety." *Id*. At an appointment on October 16, 2013 for knee and abdominal pain, a psychiatric self-questionnaire that the Plaintiff completed for his primary care doctor was "suggestive of severe depression;" the physician wrote that the Plaintiff "seems to have some component of post traumatic stress disorder" connected to the assault. (*Id*. at 7). The notes also indicate that the Plaintiff's wife told the doctor that they were having difficultly finding a Spanish-speaking psychiatrist in the area covered by their health insurance plan to treat the Plaintiff. (*Id*. at 7). Physician's records from a

later appointment on May 19, 2014 indicate that the Plaintiff continued to exhibit some symptoms of depression. (*Id*. at 10).

During discovery, the Plaintiff admitted that he had been treated for anxiety and depression prior to his arrest.  (Burgos Dep. 147:3-22, Docket No. 73-4; Pl.'s Response to Defs.' Interrogatory No. 22, Docket No. 73-1).  He claims that due to this incident he continues to experience "nights when he can't sleep" and that he suffers for anxiety when he sees police officers or thinks about what happened to him.  (Burgos Dep. 149:1-4).

The Plaintiff also submitted three photographs which he testified were taken by his son the day after his arrest to document his physical injuries.  (Pl.'s Photos at 1-3, Docket No. 73-6; Burgos Dep. at 133-138).  These photos appear to show the Plaintiff's extremities, though they are taken at such close range that perspective is difficult.  One appears to show a small red mark or possible abrasion, and the other two show light pink areas or indentations which could be light bruises or irritation.

**Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  To escape summary judgment, a factual dispute must be both "genuine" and "material."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is "genuine" if the evidence is such that a reasonable factfinder could find in favor of the nonmoving party.  *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" if it might affect the outcome of the suit under the applicable law.  *Id*.

The moving party is responsible for "identifying those portions [of the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It can meet its burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the nonmoving party's case."" *Rakes v. United States*, 352 F.Supp.2d 47,52 (D. Mass. 2005), *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex*, 477 U.S. at 325).  Once the moving party shows the absence of any disputed material fact, the burden shifts to the non-moving party to place at least one material fact into dispute.  *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (citing *Celotex* at 325).  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002).

## Discussion

## Motion to Strike

Defendants seek to strike any statements about an assault or police involvement in an assault against the Plaintiff from  ¶¶ 72-75, 77, and 81 of the Plaintiff's Statement of Additional Facts and the corresponding exhibits as hearsay so that they do not form part of the record for summary judgment.  (Docket No. 73, ¶¶ 72-75, 77, 81; Docket Nos. 73-8, 64-11).  The disputed statements are notes from the UMass Memorial Hospital medical records generated from the Plaintiff's July 11, 2013 trip to the Emergency Room and July 15, 2013 appointment at the Primary Care Clinic that report Plaintiff's claims to medical staff that he was "assaulted," "choked by police," and "hit in the face . . . dragged and choked." They include:

- "Pt. [patient] report being assaulted last noc c/o [complaining of] pain back & L[left] rib pain & LUE pain abd [abdominal]." (Docket No. 73, ¶ 72; Docket No. 62-11 at 1).

- Patient complained of "neck pain due to throat being choked by police last evening" at 8:06 pm. (Docket No. 73, ¶ 73; Docket No. 62-11 at 1).
- "51 [year -old male] c/o [complained of] LUQ pain + neck pain anteriorly after being arrested last night.  States he was 'assaulted' by police." (Docket No. 73, ¶ 74; Docket No. 62-11 at 8).
- Patient complained that "the police . . . assaulted [him] and [   ] that he was hit in the face and chest and abdomen several times and he was dragged and choked by police officers." (Docket No. 73, ¶ 75; Docket No. 73-8 at 1).
- "The patient clearly had [sic] traumatic event a few days ago where he was assaulted by police officers as the patient claims and has since been experiencing diffuse pain in the head, in the ribs, on the left side and his left sided abdominal pain has been getting worse." (Docket No. 73, ¶ 77; Docket No. 73-8 at 2).
- "LEFT SIDE ABDOMINAL, PAIN x 2MTHS, ACUTE PAIN SINCE ASSAULTED." (Docket No. 73, ¶ 81; Docket No. 73-8 at 4).

"Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c). Hearsay statements are generally not admissible in court unless an exception applies.  Fed. R. Evid. 802.

Although the nurses' and physicians' notes are hearsay, they are partly shielded form exclusion by Fed. R. Evid. 803(4), which provides an exception to the rule against hearsay for:

> (4) Statements for purposes of medical diagnoses or treatment.  Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment.

The Plaintiff's statements about his physical pain, and that it was caused by an "assault," "hitting," "choking," or "dragging," fall within the 803(4) exception, and would be admissible at trial.  The Plaintiff went to UMass Memorial to obtain medical care.  He described his symptoms and how he was injured to the medical staff there so that the nurses and doctors treating him could choose an appropriate course of care.  Any statements that the staff recorded

in their medical records about the Plaintiff's pain or its origin are covered by Rule 803(4) and are therefore part of the record for summary judgment.

The Plaintiff's statements identifying the police as his attackers are not admissible and so do not form part of the record for summary judgment. The 803(4) exception does not typically apply to statements about fault. Fed. R. Evid. 803(4) Advisory Committee Note to Paragraph 4. In rare circumstances, statements which identify the party at fault may be allowed if they are "reasonably pertinent" to the patient's medical treatment or diagnosis, such as in child sex abuse cases. *Danaipour v. McClarey*, 386 F.3d 289, 298 (1st Cir. 2004) (affirming admission of statement relevant for the patient's treatment or diagnosis). Here, however, knowing who attacked the Plaintiff is not reasonably pertinent to the Plaintiff's medical diagnosis and treatment for his physical injuries.

The Defendants' Motion to Strike is ***denied***, except as it pertains to statements that identify the police as the Plaintiff's assailants. I will not consider those statements for the purposes of the summary judgment motion.

## **Motion for Summary Judgment**

### Counts I and V: Post-arrest Excessive Force and Assault and Battery (Sgt. Roche)

The Plaintiff stipulated to dismiss his pre-arrest excessive force and assault and battery claims, so for the purposes of Count I (excessive force) and Count V (assault and battery), only Sgt. Roche's conduct *after* the Plaintiff's arrest is at issue. (Docket No. 61).

*Excessive Force*

Section 1983 creates a cause of action for plaintiffs whose substantive rights under the Constitution or U.S. laws have been violated by persons acting under color of state law. *Graham*

*v. O'Connor*, 490 U.S. 386, 393 (1989).  Because there is no dispute that Sgt. Roche was acting in his official capacity during the search and Plaintiff's arrest at Oread Street, the only issue before the Court is whether his actions violated the Plaintiff's constitutional right to be free from unreasonable search and seizure.

The legal standard for evaluating whether a police officer used excessive force after a defendant's arrest through the time of his probable cause hearing is objective reasonableness. *Miranda-Rivera v. Toledo-Dávila*, 813 F.3d 64, 70 (1st Cir. 2016).  An officer's subjective intent or motivation are not relevant. *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010) (quoting *Graham* at 397).  Instead, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009).

As there is no "precise definition" of reasonableness, courts must pay "careful attention to the facts and circumstances of each particular case." *Graham* at 396.  The Supreme Court has instructed courts to consider three factors when evaluating excessive force claims that arise in the course of arrest: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  "[N]ot every push or shove" will substantiate an excessive force claim, but "serious injury" is not required. *Gaudreault v. Salem*, 923 F.2d 203, 205 (1st Cir. 1990); *Bastien v. Goddard*, 279 F.3d 10, 14-15 (1st Cir. 2002).  Reviewing courts "must make allowance for the need of police officers to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Berube v. Conley*, 506 F.3d 79, 83 (1st Cir. 2007).  In other words, reasonableness must be judged "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham* at 396.

The Defendants claim that the Plaintiff has not offered enough evidence that a reasonable juror could find that Sgt. Roche used excessive force after arresting him.  At the summary judgment stage, a plaintiff "can no longer rest on the pleadings" but must "present affirmative evidence." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Beyond his pleadings, the Plaintiff has provided the following evidence: the Plaintiff's deposition testimony and answers to interrogatories describing how Sgt. Roche allegedly beat him;  his wife's deposition testimony that the Plaintiff had "bruises, black spots . . . on his ear, on his face, his chest, his arms" and "[a]n injury to . . . the part in the back of the ear" following his arrest; and three color photographs taken by the Plaintiff's son the day after the Plaintiff's arrest that show faint pink abrasions or discolored areas and one small dark pink mark on what appear to be the Plaintiff's arms. (Pl.'s Photos at 1-3, Docket No. 73-6).  None of the Plaintiff's photographs show the Plaintiff's ear, ribs, or back, the areas where the Plaintiff alleges that Sgt. Roche allegedly struck him repeatedly after his arrest. (The Plaintiff also alleges that Sgt. Roche forced his handcuffed arms up into a painful position behind his back, but the Court would not expect to see evidence of such an injury in photographs.)

Viewing the evidence in the light most favorable to the Plaintiff, as the Court must, the Plaintiff had visible markings on his body in the locations where he claims Sgt. Roche struck him after his arrest, including bruises and black spots.  However, the police station booking photos, which depict the Plaintiff's face and side profile but not his bare torso, do not any show any injuries to the plaintiff's ear.  UMass Memorial nurses and physicians who examined the plaintiff on July 11 and July 15 did not report any cuts, bruising, swelling, marks, or signs of trauma aside from a possible chest wall contusion.  His CT scan and X-ray were normal, and one

13

physician went so far as to say that he appeared to be uninjured.  His chief complaint during those visits—abdominal pain—predated the arrest by several months.

None of the Plaintiff's evidence contradicts the medical reports or booking photos. Therefore, whatever level of force Sgt. Roche used did not result in more than light bruising which had substantially faded or disappeared by the time the Plaintiff visited the emergency room approximately 24 hours later.

Applying the three *Graham* factors, the use of such a small amount of force was not objectively unreasonable.  The Plaintiff had just been arrested, and was ultimately convicted of resisting arrest. However, after his arrest, he was physically and verbally compliant. He had no weapon and his arms were handcuffed behind his back, so he no longer represented a threat to Sgt. Roche or any of the officers in the apartment.  At that point, it would have been unreasonable for Sgt. Roche to strike him repeatedly on the ear, ribs, and back, and to force his arms upward into a painful position.

However, the Plaintiff's  medical records and pictures do not support his version of events.  He testifies that he was struck repeatedly, but in the days after the incident primary care and emergency room medical personnel found no evidence of bruising, cuts, swelling, or other trauma beyond one potential contusion.[1]  No one else present in the apartment at the time of the alleged beating witnessed any use of force against him after his arrest, and the one potential contusion observed by his medical team or the bruises noted by his wife could also have been caused before his arrest during the hallway struggle.

The cases that the Plaintiff cites in his opposition brief where courts outside of the First Circuit have sustained post-arrest excessive force claims against summary judgment can be

---

[1] The Oxford Dictionary defines a contusion as "a region of injured tissue or skin in which blood capillaries have been ruptured; a bruise."

14

distinguished from the case at bar.  The plaintiff who alleged that a police officer had punched him four times after his arrest and neutralization in *Curtis v. Michael Wade Mosher* presented hospital records that showed acute pain, concussion and loss of consciousness, and a chest contusion, and witnesses present at the scene disputed the officer's narrative of the arrest. Case No. 3:12-cv-4866-B at 14-15, 19 (N.D. Tex. June 3, 2014).  In *Bumpas v. Ryan*, the court denied summary judgment in the face of officers' denials that they had kicked the Plaintiff in the face after his arrest based on medical records showing that the Plaintiff's eye was "approx. half shut & blood noted from the corner of the eye to middle of eye" and recommending transportation to a nearby hospital for an ophthalmology evaluation "ASAP."  2013 WL 2418258 at *7, 15-16 (M.D. Tenn. Jun. 3, 2013) (not reported).  The Sixth Circuit affirmed *Lucier v. City of Ecorse*, but the alleged excess force there was a slap in the face, not a beating of such intensity that a reasonable factfinder would expect it to cause some injury detectable by medical professionals, especially in the face of the Plaintiff's claims that he was "bruised all over."  601 Fed.Appx. 372, 379-380 (6th Cir. 2015).  *Pirgram* and *Carico*, which also stand for the proposition that even a slap can constitute excessive force against a compliant arrestee, suffer the same deficiency as *Lucier.  Pirgram ex rel. Pirgram v. Chuadoin*, 199 Fed.Appx. 509, 513-14 (6th Cir. 2006); *Carico v. Benton, Ireland, and Stovall*, 68 Fed.Appx. 632, 637 (Jun. 26, 2003).  The plaintiffs alleged serious beatings in *Curtis* and *Bumpas* and presented medical evidence or other eyewitness testimony to corroborate their accounts; the plaintiffs in *Pirgram*, *Carico*, and *Lucier* did not allege the degree of force that the Plaintiff here has, so the absence of any physical evidence of their injury is not as persuasive as it is here, where I must determine what a jury could reasonably infer about the amount of force used against the Plaintiff based on the available

evidence before deciding whether a genuine dispute about whether that level of force was unreasonable under the circumstances exists.

It is not the Court's role to evaluate the credibility of witness testimony, but I must evaluate the strength of the evidence which supports that testimony to determine whether there is enough support for the Plaintiff's claims to proceed to trial.  In this case, the evidence is simply inadequate for a reasonable factfinder to find that Sgt. Roche used excessive force against the Plaintiff after his arrest, even when viewed in the light most favorable to the Plaintiff.  Therefore, I ***grant*** the Defendants' motion for summary judgment as to excessive force.

### *Assault and Battery*

The Plaintiff has also asserted an assault and battery claim against Sgt. Roche based on the same underlying facts as his excessive force claim under Massachusetts law.  Where "a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the] determination of reasonableness of force used under § 1983 controls [the] determination of the reasonableness of the force used under the common law assault and battery claims." *Raiche v. Pietrowski*, 623 F.3d 30, 40 (1st Cir. 2010).  Because there is no genuine dispute of material fact about whether Sgt. Roche's post-arrest use of force against the Plaintiff was reasonable, the Defendants' motion for summary judgment with respect to post-arrest assault and battery must be ***granted*** as well.

### Count IV: Conspiracy (Sgt. Roche and Detective Morris)

Count IV of the First Amended Complaint ("FAC") alleges that all the police officers who were present at the Oread Street search and the Plaintiff's arrest "conspire[d] to hide [the Plaintiff's] beating by preparing and submitting false police reports." (FAC ¶ 272-73, Docket

No. 1-1).  This implies that the conspiracy was formed *after* the alleged excessive force, and its purpose was to hide that excessive force had been used by filing false police reports.  But in the Plaintiff's summary judgment opposition papers, he instead says that the goal of the conspiracy was to *use* excessive force against the Plaintiff, rather than *hide* the fact that it had occurred. (Pl.'s Opposition, Docket No. 74 at 7) ("Burgos claims defendants' Roche and [name omitted] engaged in a civil rights conspiracy . . . the goal of which was to use excessive force against him.").  That implies that the conspiracy was formed *before* the application of the alleged excessive force.

It is the parties' responsibility to elucidate each cause of action and the facts supporting it in their initial pleadings.  Not only are the purpose and the timing of the formation of the alleged conspiracy unclear from the FAC and the Plaintiff's summary judgment opposition, the FAC does not identify whether Count IV is a common law or civil rights conspiracy claim.  Earlier this year, I admonished Plaintiff's counsel for improperly recharacterizing a conclusory conspiracy claim for common law conspiracy to file false police reports in their complaint as a civil rights conspiracy to use excessive force in their opposition to summary judgment.  *Deptula v. City of Worcester*, 2020 WL 1677633 at *8 (D. Mass. Apr. 6, 2020).  The Court will not continue to indulge this error.

Because the Plaintiff stipulated to dismiss Count IV against all Defendants except for Sgt. Roche and Det. Morris (Docket No. 61), I will only examine the evidence pertaining to a conspiracy between those two officers.

The FAC alleges that Det. Morris filed a false police report (Incident Rep., Docket No. 64-1) that intentionally misstated the degree of force used against the Plaintiff in the moments before and after his arrest, and that Sgt. Roche failed to file a report documenting that he had

17

used any force at all, as was required by Worcester Police Department Policy 400.  (FAC ¶ 129-130).  The Plaintiff argues that the record contains sufficient evidence to permit a reasonable inference that Roche and Morris conspired to use excessive force against him, or otherwise violate his civil rights.

Count IV does not survive summary judgment whether I construe it as a common law conspiracy under Massachusetts law or a § 1983 civil rights conspiracy under federal law.  A civil rights conspiracy is:

> "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the two parties to inflict a wrong against or injury upon another, and an overt act that results in damages."

*Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008).  To recover, the plaintiff must demonstrate "an actual deprivation of a right secured by the Constitution and laws."  *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988) (citations omitted).  It also requires at least "sufficient circumstantial evidence of a conspiracy" that is more than "speculation and conjecture."  *Jesionowski v. Beck*, 937 F.Supp. 95, 105 (D. Mass. 1996); *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir. 1986).

Because there is not enough evidence for a reasonable factfinder to find that Sgt. Roche's post-arrest use of force was excessive, *see supra* Count I: Excessive Force, there is no actual deprivation of the Plaintiff's civil rights upon which to ground a civil rights conspiracy claim. Even if there was sufficient evidence of excessive post-arrest use of force, the Plaintiff has not offered sufficient affirmative evidence of a conspiracy's existence.  There is no evidence that Sgt. Roche filed a false report connected to the underlying incident.  Therefore the Plaintiff must show enough evidence for a reasonable factfinder to infer that Officer Morris falsified his incident report due to some underlying agreement with Sgt. Roche.

18

If the conspiracy was formed before the Plaintiff's arrest and its goal was to use excessive force on the Plaintiff, as the Plaintiff now claims in his opposition papers, then the Plaintiff's testimony cuts against any agreement or understanding between Det. Morris and Sgt. Roche about the use of excessive force.  The Plaintiff testified that as Sgt. Roche was beating him after he was handcuffed, Det. Morris exclaimed, "What the hell are you doing?  No, no, no, no." (Burgos Dep. 110:17-111:15, Docket No. 73-4; Pl.'s Response to Defs.' Interrogatory No. 3, Docket No. 73-1).[2]  Nor is there any evidence that Det. Morris and Sgt. Roche applied excessive force "in concert," which the Plaintiff contends creates an automatic genuine issue of material fact under *Jesionowsi v. Beck*, 937 F.Supp. 95, 105 (D. Mass. 1996).  The Plaintiff's account states that Det. Morris helped Sgt. Roche handcuff him, but not that Det. Morris helped Sgt. Roche batter him afterwards. This is not, as the Plaintiff contends, like *Houde*, where the plaintiff claimed that six officers acted together to apply excessive force, with four officers physically holding or striking the plaintiff, a fifth using pepper spray, and a sixth standing as close as two feet away.  *Houde v. City of Worcester*, Case No. 4:05-40075 at *10, Docket No. 45 (D. Mass. Sep. 30, 2017).

If the conspiracy was formed after the Plaintiff's arrest and beating and its goal was to conceal Sgt. Roche's use of excessive force, as I infer from the conclusory allegations in the FAC, there is insufficient circumstantial evidence of an agreement between Sgt. Roche and Det. Morris.  The Plaintiff argues that a reasonable factfinder could infer "a code of silence" between Roche and Morris to hide the truth about what had happened, as I did in *Ramirez*.[3]  *Ramirez v.*

---

[2] Response to Interrogatory No. 3: "As I was being led out the bedroom I heard Officer Morris say "Steve what the hell are you doing? . . . Stop, stop."
[3] The Plaintiff's opposition brief says that a factfinder could infer a code of silence between the four co-Defendants like my finding in *Ramirez*, but the Plaintiff dismissed his conspiracy claim as to all Defendants except Sgt. Roche and Det. Morris.

*City of Worcester*, 252 F.Supp.3d 29, 33 (D. Mass. 2017).  But in *Ramirez* the two officers

accused of concealing excessive force through false police reports provided inconsistent

statements.  One conspirator had waited more than two and a half years to write his report

regarding the underlying arrest, and the reports' descriptions of the amount of force used and the

resulting injuries did not appear to be sufficient or complete given the evidence that the plaintiff

was bleeding, his teeth were broken, he had to have his jaw wired shut, and he had to undergo

reparative surgery to have a metal plate inserted into his mouth.  *Ramirez* at 31-32.  Here, there

are no similar delays or inconsistencies between the Plaintiff's injuries (as shown in

contemporaneous photographs and described in his medical records) and Morris' Incident Report

that would lead a reasonable factfinder to infer a conspiracy or "code of silence" between Morris

and Roche.

 Having found insufficient evidence of a civil rights conspiracy, I turn to whether the

Plaintiff has provided sufficient evidence of a common law conspiracy.

 There are two types of common-law conspiracies under Massachusetts law.  The first

type requires proof of coercion: a plaintiff "must allege that the defendant and others combined

have a special coercive power that they did not possess individually."  *Farrah ex rel. Estate of*

*Santana v. Gondella*, 725 F.Supp.2d 238, 248-49 (D. Mass. 2010) (citing *Aetna Cas. Sur. Co. v.*

*P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994).  The second type requires a plaintiff to

allege "a common design or agreement, although not necessarily express, between two or more

persons to do a wrongful act and second, proof of some tortious act in furtherance of the

agreement."  *Aetna* at 1563-64.  Because the Plaintiff has not alleged any coercion, I will assume

he is proceeding under the second theory.  As I determined in the context of the civil rights

conspiracy claim, the Plaintiff's evidence is too thin to allow a reasonable factfinder to find a common design or agreement, even a non-express one, between Roche and Morris.

Because the Plaintiff does not provide sufficient evidence for a reasonable factfinder to infer either a common law conspiracy or a civil rights conspiracy, I ***grant*** the Defendants' motion for summary judgment as to Count IV.

<u>Count VIII: Intentional Infliction of Emotional Distress (Sgt. Roche)</u>

To make out a claim for intentional infliction of emotional distress ("IIED"), the Plaintiff must show: (1) that [the Defendant] intended, knew, or should have known that his conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." *Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 161 (1st Cir. 2017) (*citing Polay v. McMahon*, 468 Mass. 379, (Mass. 2014)).

"The standard for making a claim of intentional infliction of emotional distress is very high." *Doyle v. Habro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996). "Conduct qualifies as extreme and outrageous only if it 'go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community.'" *Id*. at 1128-29. The ensuing distress must be so severe "that no reasonable man could be expected to endure it." *Davignon v. Clemmey*, 322 F.3d 1, 8 n.2 (1st Cir. 2003). Liability cannot be based on mere threats, insults, or annoyances, or even "threats and petty oppressions." *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994); *Conway v. Smerling*, 37 Mass. App. Ct. 1,8 (Mass. App. Ct. 1994). Nonetheless, a trier of fact is "entitled to put as harsh a face on the [defendant's actions] as the basic facts would reasonably allow." *Richey v. American Auto. Ass'n*, 380 Mass. 835, 839 (Mass. 1980).

The Plaintiff's IIED claim fails because he cannot prove that Sgt. Roche's conduct was extreme and outrageous.  According to the Plaintiff, under *Poy v. Boutselis* if there is: 1) evidence of actual injury and 2) direct or indirect evidence of distress, then an IIED claim does not fail based on a judge's pre-trial finding that a plaintiff's emotional distress is not severe. (Pl.'s Opposition at 12, Docket No. 74).  This overstates the First Circuit's holding in *Poy* and overlooks the lack of evidence of actual injury in this case.  Actual injury is not a prerequisite for an IIED claim, but Sgt. Roche's use of physical force is the Plaintiff's strongest ground to show extreme and outrageous conduct.  Since there are no other witnesses or evidence of the degree of force he used, some evidence of physical injury is critical to allow a jury to substantiate the Plaintiff's version of events and find that excessive force was used.  Sgt. Roche's remark that he would urinate in the Plaintiff's fish tank and make him drink it is repulsive, but it does not rise to extreme and outrageous conduct because Roche did not take transform it into more than offensive words by taking steps to follow through.  Similarly, his destruction of personal property in the Plaintiff's room does not give rise to a claim for severe emotional distress, as the property described is not of an intimate or irreplaceable nature.

In *Poy*, the First Circuit upheld a jury verdict for IIED where at trial Poy and two witnesses testified that an off-duty police officer working as a security guard struck Poy repeatedly on his face and neck without provocation, knocked him to the floor, held his arms behind his back, and punched Poy using his handcuffs as brass knuckles, resulting in a wound that required five stitches and left a visible scar on Poy's forehead and resulted in two months of pain in various parts of his body.  352 F.3d 479, 485-86 (1st Cir. 2003).  Poy did not offer any medical or psychiatric evidence, but the First Circuit held that "[a] jury could reasonably infer

from such humiliation, long continued pain, and facial disfigurement a condition of severe emotional distress." *Id*.

*Poy* supports the Plaintiff's argument that a plaintiff can prevail on an IIED claim in the absence of psychiatric treatment records documenting their emotional distress <u>and</u> medical records documenting their physical injury.  Unlike *Poy*, where two witnesses testified about the beating and Poy had a scar on his face to show to the jury, the Plaintiff has no witnesses and even the most favorable reading of his medical records and photos show that the beating he describes did not result in any injuries beyond one possible contusion on his chest and abdominal pain that predated the incident.  Without more evidence, he cannot prove that Sgt. Roche's conduct was so extreme and outrageous that it would allow a jury to infer severe emotional distress, as the jury did in *Poy*.

According to the Plaintiff, a jury could reasonably find that "getting hit with a loaded gun in the head coupled with his injury, his testimony that he thought he was going to be die and the testimony of Dr. Cutler who opines that he continues to suffer sequela from his injury satisfies the elements of IIED." (Plaintiff's Opp. at 10, n. 5, Docket No. 74).  This assertion is flawed on several fronts. First, the Plaintiff testified that he was hit in the head with what felt like a gun *before* he was handcuffed, and *Heck* bars tort claims based on the police's pre-arrest conduct because of the Plaintiff's conviction for resisting arrest.  (Burgos Dep. at 106:19-108:13, Docket No. 73-4).  Second, there is no reference in the summary judgment record to a Dr. Cutler, so that person's medical or psychiatric opinion about the Plaintiff is inadmissible hearsay.[4]  Third, not

---

[4] Neither the Plaintiff's Statement of Material Facts, deposition, responses to interrogatories, or medical records refer to a Dr. Cutler, who makes his first appearance in the Plaintiff's opposition brief to the Defendants' summary judgment motion.  Dr. Sonia Bagga, a primary care physician at UMass Memorial who saw the Plaintiff on October 16, 2013 noted that his behavior was suggestive of severe depression and that he "seem[ed] to have some component of posttraumatic stress disorder." (Docket No. 73-8 at 7).

even a generous reading of the Plaintiff's deposition testimony and his detailed answers to the Defendants' interrogatories imply that Sgt. Roche's conduct put the Plaintiff in fear of his life.

The Plaintiff's IIED claim fails because he cannot prove extreme and outrageous conduct, so I need not consider the remaining three factors.  Whether the Plaintiff has offered sufficient evidence of severe emotional distress is a closer call.  The Plaintiff testified that the incident has made him anxious around police, he had difficulties sleeping, and developed depression during a period in which did not want to leave the house and would cry often.  (Pl.'s response to Def.'s Interrogatory No. 15, Docket No. 73-1).  His primary care provider prescribed him a drug to treat anxiety and gave him a diagnostic questionnaire to self-report his symptoms that suggested severe depression.  The Defendants emphasize that the Plaintiff could not have experienced severe emotional distress because he only sought treatment for emotional trauma "once or twice," but ignore the Plaintiff's credible testimony that he could not find a Spanish-speaking psychiatrist covered by his healthcare plan, which is supported by the medical records from his primary care visit with Dr. Bagga. (Burgos Dep. 148:3-18, Docket No. 73-4; UMass Records at 7, Docket No. 73-8).

Nonetheless, because the Plaintiff has not presented sufficient evidence to prove that Sgt. Roche's post-arrest conduct was extreme and outrageous, I **_grant_** the Defendants' motion for summary judgment as to the Plaintiff's IIED claim.

## Conclusion

For the reasons stated above, the Defendants' Motion to Strike (Docket No. 75) is **_granted_** in part and **_denied_** in part.  Defendants' Motion for Summary Judgment (Docket No. 62) on Counts I, IV, V, and VIII is **_granted_**.

**SO ORDERED.**

*/s/ TIMOTHY S. HILLMAN*
**DISTRICT JUDGE**
